UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| BRADLEY JONES, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 16-51-GFVT |
| | ) | |
| v. | ) | |
| | ) | |
| SUE CAROLE PERRY, individually and in | ) | **OPINION** |
| her official capacity as Shelby County | ) | **&** |
| Clerk, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

*** *** *** ***

Bradley Jones and Kathryn Brooke Sauer simply want to get married.  Defendant Sue Carole Perry, the Shelby County Clerk, refuses to issue them a marriage license.  She insists that Kentucky law prohibits her from doing so unless both Jones and Sauer physically appear at the clerk's office to apply for a license.  Sauer happens to be a prisoner at the Kentucky Correctional Institution for Women, so she cannot travel to the clerk's office for this purpose.

Although Perry believes that Kentucky law compels her to prevent Jones and Sauer from exercising their fundamental right to marry, the relevant statutes tell a different story.  In fact, these statutes make no mention of Perry's in-person requirement, nor do they otherwise discuss the significance of a marriage applicant's presence at the clerk's office.  The blanket in-person requirement is a contrivance of Perry and other government officials of this Commonwealth.  It is also unconstitutional.  For that reason, the Court will now permanently enjoin Perry from enforcing this requirement against Jones in the future.

# I

Jones and Sauer were only teenagers when they first met at Westport Middle School in 1994.  [R. 4-2 at 1.]  They dated for about a month, after which Sauer moved away from Louisville with her family.  [*Id.*]  Jones never forgot about her.  He spent a lot of time "in and out of juvenile institutions and prison for a variety of non-violent charges" over the next ten years, and he and Sauer lost touch.  [*Id.*]  When he finally exited the prison system, Jones began looking for her.  He recalls "talk[ing] to mutual friends, search[ing] the White Pages, and . . . eventually us[ing] sites like Facebook to try to locate her."  [*Id.*]  Years passed without any luck.  Then, in 2014, he ran into an old middle school classmate who was still friends with Sauer.  [*Id.* at 2.]  She told him that Sauer had experienced her own share of legal trouble over the years, and that she was currently serving a long-term prison sentence.  [*Id.*]

Given his history, Jones "understood how much it means to an incarcerated person to talk to people on the outside."  [*Id.*]  He and Sauer began exchanging letters and talking on the phone.  [*Id.*]  What started "as a rekindled friendship eventually led to a rekindled romantic relationship."  [*Id.*]  Jones then obtained approval to visit her at the Kentucky Correctional Institution for Women ("KCIW").  [*Id.*]  At their first in-person encounter since middle school, he proposed marriage.  She said yes.  He has continued to visit her "twice a week nearly every week since then."  [*Id.*]

Sauer is not eligible for parole until June of 2026.  [*Id.* at 3.]  Because of his religious beliefs, Jones does not believe he can "or should wait until then to solidify their bond before God and the Commonwealth of Kentucky."  [*Id.* at 2.]  But state officials have consistently thwarted the couple's attempts to marry.  Jones reports that he has contacted "numerous county clerks"

throughout the Commonwealth and "not one [will] agree to grant [the couple] a marriage license." [*Id.*]

One of these clerks is Defendant Sue Carole Perry.  She is the clerk of Shelby County, Kentucky, where KCIW is located.  When Jones sought a marriage license from Perry in July 2016, she told him that "her office interprets Kentucky law as saying both parties must be present to issue a marriage license." [*Id.* at 3.]  Jones informed her that his fiancée could not appear at the clerk's office because she was in prison, "but [Perry] still refused to issue a license." [*Id.*]  Prison officials at KCIW also offered no help; in a letter sent to Jones that same month, Warden Janet Conover informed him that she had "no objection to the marriage," but that "both parties must be present [at the clerk's office] to obtain a license and [the prison does] not transport inmates for this reason." [R. 4-5 at 1.]

Jones later asked Perry to identify what "Kentucky law" prevented her from issuing the couple a license. [*Id.* at 3.]  Rather than cite a Kentucky statute, Perry supplied a memo that she received from the Kentucky Department for Libraries & Archives ("KDLA") in 2008.  This memo noted that marriage license applications have "signature places for both the bride and groom." [R. 4-6 at 1.]  And because KRS § 402.110 states that clerks must "see to it that every blank space required to be filled by the applicant is so filled before delivering" a marriage license, the KDLA determined that "the county clerk in each county must have both parties sign the application and both must be present at that time." [R. 4-6 at 1.]  The department also claimed to have reached this conclusion "after consulting with" Kentucky's Attorney General. [*Id.*]

In 2009, however, the Office of the Attorney General ("OAG") expressed a very different opinion.  The OAG issued a letter in response to a question from the Education and Workforce

Development Cabinet (which houses the KDLA) about "the inability of incarcerated persons to obtain a marriage license because they cannot present themselves to the county clerk." [R. 8-1 at 1.] The office declined to issue a formal opinion "because litigation [was] being contemplated," but did note that the in-person requirement likely interfered with a prisoner's fundamental right to marry. [*Id.* at 2.] The OAG affirmed that "public officials cannot sit on their hands and frustrate an incarcerated person's right to marry," and advised the state to adopt "procedures . . . to assist incarcerated persons in exercising" that right. [*Id.* at 1-2.]

Seven years after the OAG warned public officials not "to sit on their hands and frustrate an incarcerated person's right to marry," Jones walked into the Shelby County Clerk's Office. Perry refused to issue him a marriage license. He then filed a Motion for Preliminary Injunction in this Court, arguing that Perry's in-person requirement violates his "fundamental right to marry . . . which is guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution." [R. 4-1 at 1.]

## II

### A

#### i

Before reaching the substance of Jones's request, the Court must first decide whether to treat his motion as one for a preliminary or permanent injunction. Ordinarily, courts should not convert a motion for a preliminary injunction into one for a permanent injunction without first holding an evidentiary hearing. *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1174 (6th Cir. 1995). But no hearing is required when the dispute concerns a "purely legal question" and there are "no triable issues of fact." *United States v. McGee*, 714 F.2d 607, 613 (6th Cir. 1983).

About a week before the parties met for oral argument, the Court directed them to "come to [the] hearing prepared to discuss" whether any triable issues of fact existed in this case.  [R. 7 at 1.]  At oral argument, the Court proposed that this lawsuit boils down to one purely legal question: does Perry's in-person requirement place an unconstitutional burden on Jones's fundamental right to marry?  [TR: Oral Argument at 5.]  Jones's counsel agreed that no triable issues of fact remained and expressed no objection to treating his motion as one for a permanent injunction.  Perry's counsel, however, made two half-hearted attempts to identify a triable issue of fact.  Rather than highlight a genuine factual dispute, however, counsel established only her lack of familiarity with the record.

Counsel first attempted to argue that there was no "proof" Sauer even wanted to marry Jones.  [*Id.* at 5.]  This claim ignores Jones's sworn affidavit, signed under penalty of perjury, expressly affirming that Sauer accepted his marriage proposal.  [R. 4-2 at 2.]  It also ignores the undisputed statement of Janet Conover, the KCIW Warden, that Sauer has submitted a request to marry Jones.[1]  [R. 4-5 at 1.]  In any event, the Court is reluctant to attempt the unwieldy task of "proving" Sauer's desire to get married.  Jones does not ask the Court to order Sauer to marry him; he merely asks the Court to order the county clerk to give him the *opportunity* to marry her.  Jones and Sauer may change their minds more than once between now and the moment they

---

[1]  Perry never questioned the authenticity of this letter, and she has waived any argument about its admissibility.  But the Court notes that this document appears on official letterhead, bears the seal of the Commonwealth of Kentucky, and contains the original signature of Warden Conover.  [R. 4-5 at 1.]  It is therefore self-authenticating under Fed. R. Evid. 902(1).  *See, e.g., Alexander v. CareSource*, 576 F.3d 551, 561 (6th Cir. 2009) (finding document that bore "the Seal of the State of Ohio" and the signature of an agency's "team leader" was self-authenticating).  And because it is a "record or statement of a public office" that sets out "the office's activities" and refers to "factual findings from a legally authorized investigation," it would also fall under the hearsay exception identified in Fed. R. Evid. 803(8)(A)(i).

place pen to paper.[2]  But the couple will never reach that defining moment until the county clerk gives them the legal right to marry.  That is the essence of due process.

Second, counsel also argued that there was no "evidence . . . there's been any request to transport" Sauer to the county's clerk's office, and that it was unclear whether the Department of Corrections prohibited the transport of prisoners "for the purposes of obtaining a marriage license."  [*Id.* at 7.]  The Court then read aloud the Warden's official letter from July 2016, which states that "both parties must be present [at the clerk's office] to obtain a license and [the prison does] not transport inmates for this reason."  [R. 4-5 at 1.]  Counsel responded, "Fair enough, Your Honor," and then changed the subject.  [TR: Oral Argument at 9.]

Given counsel's admitted confusion about the record, it is unclear if Perry still objects to conversion of Jones's motion.  To the extent that Perry intends to preserve this objection, the Court easily finds that no triable issues of fact remain here.  The Court gave Perry an opportunity to identify a genuine factual dispute, and she failed to do so.  She makes no attempt to explain the value of holding an evidentiary hearing, nor has she identified any potential facts that might undermine Jones's sworn affidavit or Warden Conover's unequivocal statement.  In the absence of any legitimate dispute, the Court will treat Jones's motion as one for a permanent injunction.

### ii

To obtain a permanent injunction, a plaintiff "must first establish that [he has] suffered a constitutional violation."  *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006).  And even if the Court finds that a violation occurred, the plaintiff must also "demonstrate: (1) that [he] has suffered an irreparable injury; (2) that remedies available at law,

---

[2]  Perry later offered the tangential claim that the Warden's letter only established "that [Sauer] said in April that she wanted to marry him, but as we stand here today . . . we don't have that knowledge."  [TR: Oral Argument at 35.]  By this logic, the Court would have to ask Sauer to testify on the same day it entered judgment in this case, lest she change her mind in the time it took to write the present order.  And what if she changed her mind an hour later?

such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).[3]

## B

### i

The constitutional right at issue here is plain. The right to marry "has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men" and women. *Loving v. Virginia*, 388 U.S. 1, 12 (1967). This freedom "is one of the most basic civil rights of every [human being], fundamental to our very existence and survival." *Id.* (internal quotations and citation omitted). Through this commitment our collective rights deepen, and "two persons together . . . find other freedoms, such as expression, intimacy, and spirituality." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2599 (2015). Many, like Jones, consider "the commitment of marriage [to] be an exercise of religious faith as well as an expression of personal dedication." *Turner v. Safley*, 482 U.S. 78, 95–96 (1987).

For all these reasons, courts will apply strict scrutiny to any law or policy that places a "direct and substantial burden" on the right to marry. *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710 (6th Cir. 2001). This means the rule "cannot be upheld unless it is supported by

---

[3] Although Perry does not argue that Kentucky's sovereign immunity bars Jones's suit, the Court will briefly note that this case falls comfortably within the boundaries of the *Ex Parte Young* exception. This doctrine empowers federal courts to "enjoin state officials to conform their future conduct to the requirements of federal law," notwithstanding the state's typical immunity from suit. *Quern v. Jordan*, 440 U.S. 332, 337 (1979) (citing *Ex Parte Young*, 209 U.S. 123 (1908)). The exception "rests on the premise–less delicately called a 'fiction'–that when a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign immunity purposes." *Va. Office for Prot. & Advocacy v. Stewart*, 131 S. Ct. 1632, 1638 (2011); *see also Miller v. Davis*, 123 F. Supp. 3d 924, 933 (E.D. Ky. 2015) (finding that the *Ex Parte Young* exception applied to injunction request against Kentucky county clerk for refusing to issue marriage license).

sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978).  A state policy places a "direct and substantial burden" on this right when "a large portion of those affected by the rule are absolutely or largely prevented from marrying, or whe[n] those affected by the rule are absolutely or largely prevented from marrying a large portion of the otherwise eligible population of spouses."  *Vaughn*, 269 F.3d at 710.  But if the policy does not "directly and substantially interfere with the fundamental right to marry," courts will only subject the rule to rational basis review.  *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1135 (6th Cir. 1995).  This forgiving test requires the Court to find only that the policy is "rationally related to legitimate government interests."  *Johnson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010).

### ii

Perry, of course, argues that the Court should apply rational basis review to the in-person requirement.  She cites *Toms v. Taft*, 338 F.3d 519, 525 (6th Cir. 2003), for the proposition that "a prisoner's right to marry may be restricted where the restriction is reasonably related to a legitimate penological interest."  *Toms v. Taft*, 338 F.3d 519, 525 (6th Cir. 2003) (citing *Turner*, 482 U.S. at 96-97)).  That sounds a lot like rational basis review.  But *Toms* does not apply to this case.  The *Toms* court recognized only that the *penological* interests of prison systems— including, most prominently, "legitimate security concerns"—may require prison administrators to impose restrictions on a prisoner's right to marry.  *Id.* (internal quotations and citation omitted).  Perry does not manage a prison.  She cannot lean on any penological interests to rescue this policy.

What is relevant to this case, however, is *Toms*'s treatment of "the distinction between actively prohibiting an inmate's exercise of his right to marry and failing to assist" her in

exercising that right.  *Id.* at 526.  The *Toms* court found this distinction "untenable in a case in which the inmate's right will be completely frustrated without officials' involvement."  *Id.*  The OAG likely had this opinion in mind when he advised county clerks not "to sit on their hands and frustrate an incarcerated person's right to marry," and to adopt "procedures . . . to assist incarcerated persons in exercising" that right.  [R. 8-1 at 1.]  And here, unlike in *Toms*, Perry cannot gamble on any supposed penological interests to justify her refusal to adopt these procedures.

At oral argument, Perry also announced that she "would like to . . . plant the question [in the Court's mind] as to why the county clerk is the one [being sued] if the warden is also responsible for interpreting the statute."  [TR: Oral Argument at 45.]  The KCIW Warden is not a defendant in this suit.  Whether the prison's refusal to transport Sauer is "reasonably related to a legitimate penological interest" is not at issue in this case.  But the Court does note that the Warden's policy—which need only satisfy rational basis review—is more likely constitutional than Perry's, which deserves strict scrutiny.  For the purposes of this order, it is enough to say that the KCIW Warden expressly stated she will "not transport inmates" to the clerk's office to obtain a marriage license.  [R. 4-5 at 1.]  That fact, coupled with Perry's refusal to issue a license, absolutely prevents Jones from marrying Sauer.

Perry's next argument is that her policy does not impose a "direct and substantial burden" because Jones and Sauer remain free "to marry anybody they want[,] just not each other."  [TR: Oral Argument at 24.]  In support, she cites a case of this Circuit, *Vaughn*, 269 F.3d 703.  In *Vaughn*, the plaintiffs—a married couple who previously worked together in state government— challenged a state employer's policy "requir[ing] the resignation of one spouse in the event two employees marry."  *Id.* at 706.  The court found that this policy did not place a "direct and

substantial burden" on the couple because "it did not bar [them] from getting married, nor did it prevent them [from] marrying a large portion of population," but "only made it economically burdensome to marry a small number of those eligible individuals, their fellow employees at [the office where they worked]." *Id.* at 712. The court added that "[o]nce [the couple] decided to marry *one another*, [the] policy became onerous for them, but *ex ante*, it did not greatly restrict their freedom to marry or whom to marry." *Id.* (emphasis in original).

The holding in *Vaughn* does not control this case for at least three reasons.[4] First, the relevant facts in *Vaughn* are facially distinguishable from those at issue here. The *Vaughn* court's decision rested on an obvious fact that is not present in this case: the disputed policy "did not bar [the couple] from getting married," but "only made it economically burdensome" to do so. *Id.* The plaintiffs in *Vaughn* were already married by the time they filed suit. *Id.* at 708. When the *Vaughn* court stated that the employer's rule only "became onerous" after the plaintiffs "decided to marry *one another*," the "onerous" burden in question was merely an economic one. *Id.* at 712. The court's rather dismissive treatment of this *ex post* burden need not extend to the policy in dispute here, which absolutely prohibits Jones from marrying Sauer. *Cf. Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1135–36 (6th Cir. 1995) (finding mere economic burden did not "directly and substantially interfere" with right to marry, and noting "the fact that plaintiffs married with knowledge of the [disputed] policy illustrates this point."); *Montgomery v. Carr*, 101 F.3d 1117, 1125 (6th Cir. 1996) (distinguishing cases that absolutely prohibit the right

---

[4] In addition to the reasons cited below, Jones also argues that *Vaughn* is distinguishable because it concerns the "First Amendment right to associate" and not a "Fourteenth Amendment due process challenge." [TR: Oral Argument at 27.] The Sixth Circuit has expressed some skepticism about treating First and Fourteenth Amendment claims differently in this context. *See Montgomery v. Carr*, 101 F.3d 1117, 1124 (6th Cir. 1996) ("[T]he level of scrutiny to be applied to state action impinging on the right to marry is invariant with respect to the precise constitutional provision undergirding that right."). Perhaps *Obergefell* called that skepticism into question. *See Obergefell*, 135 S. Ct. at 2616 (discussing difference between First Amendment and due process challenges to marriage restrictions). Regardless, *Vaughn* is otherwise distinguishable for the reasons explained in this order.

to marry from those that "merely plac[e] a non-oppressive burden on the decision to marry, or on those who are already married.").

Second, to the extent that *Vaughn* counsels against applying strict scrutiny in all cases where a policy "only" burdens the applicants' right to marry "one another," this aspect of the court's holding is no longer good law.  That is especially true where, as here, the petitioner mounts an as-applied challenge to a policy that absolutely erases his right to marry the individual of his choice.  Fourteen years after *Vaughn,* the Supreme Court announced that "the decision whether *and whom* to marry is among life's momentous acts of self-definition."  *Obergefell*, 135 S. Ct. at 2599 (emphasis added) (internal quotations and citation omitted).  The Court cannot recognize this principle without also honoring Jones's constitutional right to marry *this woman*, the woman he freely chose.  Loved ones are not fungible commodities.

Third, *Vaughn*'s holding also rested on the fact that the employer's policy "did [not] prevent [the couple from] marrying a large portion of population," but "only made it economically burdensome to marry a small number of those eligible individuals, their fellow employees at [the office where they worked]."  *Id.* at 712.  Here, by contrast, the in-person requirement absolutely prevents Jones from marrying any person who (1) happens to be in prison and (2) cannot travel to the clerk's office.[5]  If we lived in any other country in the world, Perry might plausibly argue that prisoners do not constitute a sizeable portion of the population.  But the United States has the largest prison population on earth.[6]  And Kentucky is one reason why.

---

[5]  In truth, the policy prohibits Jones from marrying anyone who cannot travel to the clerk's office, incarcerated or otherwise.  That would also include, for example, an invalid or a diagnosed agoraphobic.
[6]  *Highest to Lowest – Prison Population Total*, WORLD PRISON BRIEF, http://www.prisonstudies.org/ highest-to-lowest/prison-population-total?field_region_taxonomy_tid=All&=Apply (last visited Sept. 28, 2016).

A recent study found that "[i]f each U.S. state were its own country, Kentucky would have the seventh-highest incarceration rate in the world."[7]  Our state jails and prisons currently house over 23,000 people.[8]  Our federal facilities have roughly 7,000 prisoners.[9]  And the problem is especially bad in Shelby County.  As of September 2016, the Shelby County Correctional Center housed 351 inmates.[10]  KCIW, located in Shelby County, had 683 prisoners.[11] According to the last census, only around 42,000 people live in Shelby County.[12] That means the prison population of KCIW alone amounts to 1-2 percent of the county's total population.  By comparison, the federal government reported in 2014 that "1.6 percent of adults [in the United States] self-identify as gay or lesbian."[13]  At the very least, then, the in-person requirement prohibits Jones from marrying a significant percentage of Shelby County residents.

These facts support one conclusion: the in-person requirement absolutely prevents Jones from marrying Sauer, and absolutely prevents him from marrying a large portion of the population.  The policy thus imposes a "direct and substantial burden" on Jones's fundamental right to marry, and it "cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests."  *Zablocki*, 434 U.S. at 388.

---

[7]  *Kentucky's Incarceration Rate Ranks 7th in the World*, WFPL NEWS (Nov. 12, 1015), http://wfpl.org/if-it-were-a-country-kentuckys-prison-rate-would-rank-7th-in-the-world/.

[8]  *Inmate Profiles*, KENTUCKY DEPARTMENT OF CORRECTIONS (Sept. 15, 2016), http://corrections.ky.gov/about/Documents/Research%20and%20Statistics/Monthly%20Reports/Inmate%20Profile/2016/Inmate%20Profile%2009-2016.pdf (last visited Sept. 28, 2016).

[9]  *Generate Inmate Population Reports*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/about/statisticspopulation_statistics.jsp (search "All Kentucky Facilities;" then click "Generate Report") (last visited Sept 28, 2016).

[10]  *Inmates*, SHELBY COUNTY DETENTION CENTER, http://www.shelbycountydetention.com/SCDC_inmatelist.html (last visited Sept. 28, 2016).

[11]  *About KCIW*, KENTUCKY DEPARTMENT OF CORRECTIONS,  http://corrections.ky.gov/depts/AI/KCIW/Pages/AboutKCIW.aspx (last visited Sept. 28, 2016).

[12]  *Quick Facts: Shelby County*, UNITED STATES CENSUS BUREAU,  http://www.census.gov/quickfacts/table/PST045215/21211,00 (last visited Sept. 28, 2016).

[13]  *Health survey gives government its first large-scale data on gay, bisexual population*, THE WASHINGTON POST (July 15, 2014), https://www.washingtonpost.com/national/health-science/health-survey-gives-government-its-first-large-scale-data-on-gay-bisexual-population/2014/07/14/2db9f4b0-092f-11e4-bbf1-cc51275e7f8f_story.html.

**iii**

Perry's rationale for imposing the in-person requirement collapses under strict scrutiny. She first argues that her policy serves the "important state interest" of ensuring that both applicants are legally eligible to marry.   [TR: Oral Argument at 26.]  The Court will accept that verifying the eligibility of marriage applicants is a "sufficiently important state interest."[14] *Zablocki*, 434 U.S. at 388.  But the in-person requirement is not "closely tailored to effectuate only" that interest.  *Id.*

At oral argument, the Court repeatedly asked Perry's counsel to explain how the in-person requirement actually promotes the state's interest in verifying the eligibility of marriage applicants.  [TR: Oral Argument at 34.]  Counsel never fully answered this question.  Without much guidance from Perry, the Court will summarize a few reasons why her policy might plausibly advance this interest.  First, the in-person requirement could encourage applicants to provide thorough and honest answers to the clerk's questions about their eligibility.[15]  Some find it easier to lie on paper than in face-to-face communication.  Second, observing an applicant's demeanor in person might make it easier to evaluate the applicant's credibility.  The subtleties of a facial expression are lost in a documentary exchange.  Third, an applicant might have some disqualifying characteristics that are readily observable in person.  A pregnant minor, for example, would have difficulty obtaining a license at the clerk's office.

Even though Perry's chosen policy may serve the interest at stake, many alternative methods could just as easily effectuate that interest.  Most evidently, Perry or one of her deputies

---

[14]  Although Perry did not rely on this rationale, the Court also notes that the in-person requirement might serve the state's interest in verifying each party's consent to the marriage.  But the alternative procedures described below would just as easily effectuate that interest.

[15]  It is not at all clear that Perry or her deputies would ordinarily ask marriage applicants any questions about their eligibility before issuing a license.  But for the purposes of this order, the Court will assume that Perry and her deputies at least occasionally inquire about the eligibility of applicants who appear at the clerk's office.

could drive up the road to KCIW and watch Sauer sign the marriage license.  That would take about twenty-five minutes.[16]  Or she could do what the clerk did in *Toms* and arrange to "deputize an employee of the 'central office' of the [prison] (specifically, an Assistant Attorney General) as a clerk to issue the marriage license" to Sauer at the prison itself.  *Toms*, 338 F.3d at 522–23.  Both of these alternatives would allow the state to preserve the benefits of observing an applicant in person.

Another alternative appears in *Amos v. Higgins*, 996 F. Supp. 2d 810 (W.D. Mo. 2014).  In *Amos*, the court confronted a Missouri statute that "required each applicant for a marriage [to] sign the application 'in the presence of the recorder of deeds or their deputy.'"  *Id.* at 811.  The court held that this requirement was unconstitutional as applied to both prisoners and their fiancées, and concluded that "[n]o party ha[d] advanced a state interest sufficiently important to obligate individuals who are engaged to be married, but unable to travel to the recorder of deeds, to execute and sign a marriage license application in the presence of the recorder of deeds or [her] deputy."  *Id.* at 813.  As an alternative procedure, the court ordered the clerk to permit each prisoner to (1) submit "all fees and other documents required for the issuance of a marriage license under the laws of the [state]," and (2) submit an "affidavit or sworn statement," verified by both "the warden or the warden's designee and . . . a notary public," that identified the "names of both applicants" and stated that "the applicant [was] unable to appear in the presence of the recorder of deeds due to [her] incarceration."  *Id.* at 814-15.

Admittedly, the *Amos* procedure addressed the clerk's concern about verifying the *identity* of marriage applicants.  Perry's expressed concern is about the *eligibility* of applicants.  In Kentucky, however, prison wardens are already required to verify the eligibility of prisoners

---

[16]  It might take closer to twenty-seven with traffic.  *See* GOOGLE MAPS, https://goo.gl/maps/ajLnxuChEC52 (last visited Sept. 28, 2016).

before they obtain a marriage license.  Kentucky's official corrections policy requires a warden to approve a marriage application in advance.  This approval process directs the warden to ensure that there are no "legal restriction[s]" to the marriage and that the "inmate making the request is not . . . incompetent."  [R. 4-4 at 1.]  This additional step, coupled with the procedure established in *Amos*, would likely resolve any questions about the prisoner's eligibility.

The Court adds that here, unlike in *Amos*, no state law actually obligates Perry to enforce the in-person requirement.  At oral argument, Perry conceded that the "underlying statutory language doesn't have an expressed in-person requirement."  [TR: Oral Argument at 13.]  In fact, the seminal provision cited by Perry, KRS § 402.080, states that a marriage license "shall be issued by the clerk of the county in which the female resides at the time, unless the female is eighteen (18) years of age or over or a widow, and the license is issued on her application in person *or by writing signed by her*." (Emphasis added).  And the provision relied upon by the KDLA, KRS § 402.110, provides only that "[t]he clerk shall see to it that every blank space required to be filled by the applicants is so filled before delivering it to the licensee."  Perry could comply with these requirements by adopting any one of the procedures outlined above.[17]

#### iv

Because Perry's policy is unconstitutional as applied to Jones, the remaining elements of the permanent injunction standard can be resolved easily.  The "irreparable harm" to Jones flows naturally from Perry's constitutional violation.  *See Overstreet v. Lexington–Fayette Urban Cnty.*

---

[17]  Perry also briefly argued that "to open the door for these individual exceptions without any formal protocol is simply opening up Pandora's Box, and [she] shouldn't be forced to do that."  [TR: Oral Argument at 16.]  The Court is not asking Perry to make a special exception for Jones.  The Court is ordering Perry to comply with the Constitution.  If Perry enforced the in-person requirement against another individual who absolutely could not appear at the clerk's office—for example, someone who was terminally ill and could not safely leave her home—that would also likely be unconstitutional.  Needless to say, the likelihood that Perry's policy may be unconstitutional in other circumstances does not preclude the Court from also finding it unconstitutional here.

*Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."); *see also Miller*, 123 F. Supp. 3d at 937 (finding county clerk's refusal to issue marriage license was unconstitutional and thus denial of injunction would cause irreparable harm). The Court cannot remedy this harm through monetary damages alone; no amount of compensation will substitute for the exercise of "one of the vital personal rights essential to the orderly pursuit of happiness by free men" and women. *Loving*, 388 U.S. at 12.

The balance of the harms also tips in Jones's favor. As explained above, Perry can satisfy her statutory duties through a range of readily available alternatives to the in-person requirement. The harm she might suffer from, for example, driving to KCIW—or perhaps asking one of her deputies to make the short trip—is minimal. And most importantly, the public has a powerful interest in vindicating "one of the most basic civil rights of every [human being], fundamental to our very existence and survival." *Id.*

### III

When state officials disrupt the free exercise of fundamental rights, courts will scrutinize their conduct with unusual precision and care. Perry's in-person requirement cannot survive that scrutiny. The Court does recognize, however, that Perry is best situated to choose from among the available alternatives to her current policy. *See Howe v. City of Akron*, 801 F.3d 718, 754 (6th Cir. 2015) ("[P]ermanent injunctions should be tailored to redress the harm without hamstringing local government."). Accordingly, the Court **HEREBY ORDERS** as follows:

(1)    Jones's motion for injunctive relief **[R. 4]** is **GRANTED**;

Case: 3:16-cv-00051-GFVT   Doc #: 12   Filed: 10/18/16   Page: 17 of 17 - Page ID#: 97

(2)      Defendant Sue Carole Perry is **PERMANENTLY ENJOINED** from requiring Sauer to appear at the Shelby County Clerk's Office prior to issuing Jones a marriage license; and

(3)      Perry shall have up to and including **Friday, November 4, 2016**, to adopt and perform a procedure that will permit Jones and Sauer to obtain a marriage license without physically appearing at the Shelby County Clerk's Office.

This the 18th day of October, 2016.

Gregory F. Van Tatenhove
United States District Judge